GEORGE W. LORD, Appellant, *v.* DELAWARE LIQUOR COMMISSION, Appellee.

*(October* 15, 1940.)

RODNEY, J., sitting.

*Frederick P. Whitney* for Appellant.

*William S. Potter* for Appellee.

Court of General Sessions for Sussex County, June Term, 1940.

Rodney, J., delivering the opinion of the Court:

I have included in the statement of facts some mention of the proceedings under the application for a license expiring June 30, 1940, because of my uncertainty as to whether the record of the oral hearing of June 20th had relevancy solely to the former application or whether such record also applied to the later application for the year 1941. The hearing was ostensibly held pursuant to *Chapter* 188, *Vol. 42, Laws of Delaware,* which requires a hearing when a protest against the granting of the license has been received, signed by ten property holders, but not requiring a hearing when no protest has been filed. A protest was duly filed as to the license expiring June 30, 1940, but no protest was received or filed in connection with the license expiring June 30, 1941.

On June 22, 1940, the Liquor Commission in refusing both applications drew a material distinction between them. As to the first application it recited it had considered the protest and evidence produced at the hearing, and based its refusal of a license "on the facts revealed at the hearing." As to the application for the license expiring June 30, 1941, the Commission is silent as to any reliance on the evidence adduced at the hearing, merely stating that the application "has been thoroughly investigated and considered."

The question has importance for the reason that if the hearing of June 20th had no relevancy to the second application, then no reasons whatever are assigned for the refusal of that license and I have a bare refusal with no reason on which it is based, and nothing to show the exercise of any sound legal discretion. I would then have no occasion to consider the record to determine whether the ruling of the Liquor Commission was based on sound discretion. For the determination of the present matter I shall assume,

without deciding, that the hearing had relevancy to the present application for a license, and that I have due authority to consider the record which has been filed by the Liquor Commission in the present proceeding.

The record shows that Bridgeville has a population of about 1,131 people, and I assume a large number of other people, living in the immediate community, use it as their shopping centre. Some thirteen witnesses were present at the hearing and the views of some four others are shown by the record. The witnesses represented a high type of citizenship and their views and testimony must receive the highest degree of consideration.

The opposition of the witnesses to the granting of the license may generally be based upon three grounds, which will be considered in their order:

1. That no licensed place for the sale of liquor has existed in Bridgeville for many years and that the majority of the residents would vote against such license if the question was submitted.

2. That there is no necessity for a licensed store in Bridgeville because licensed stores exist in Greenwood (some 5 miles to the North) and at Seaford (some 7 miles to the South).

3. That for some 5 or 6 months of each year there is employed a very large number of transient laborers and that the license of a store to sell liquor would have a bad effect on such labor and require the expenditure of an undue amount for police protection.

1. The fact that no license has existed in Bridgeville for many years is, of course, not entitled to much weight. No reasons are assigned for the absence of a license, and it is well known that for a number of years

it would have been impossible to have a license for the legal sale of liquor in Bridgeville due to so-called local option in Sussex County, and subsequently to National and State prohibition.

The fact that a large number, and perhaps as claimed a majority, of the citizens of Bridgeville would, if permitted, vote against the licensed sale of liquor, must be briefly considered. In considering this contention I must ascertain just how much weight I can give to these views, having regard to the constitutional provisions and the legal rights accruing from the Constitution and statute. The *Constitution, Article* 13, *Sec.* 2, has divided the State of Delaware into local option districts, and of these Sussex County constitutes one. The Legislature acting on its own initiative, or on the request of a majority of the members of each House from any local option district, may submit the question of license or no license to such local option district. The local option district here material, however, would be Sussex County and not the municipality of Bridgeville, lying within the county. It is common knowledge that some time prior to the adoption of the 18th Amendment to the Federal Constitution, Sussex County had voted "dry" and the legal sale of liquor in that county was prohibited; then came National and State prohibition. After the repeal of the 18th Amendment another election was held in Sussex County, resulting in a clear majority in favor of license. In 1933 the present Liquor Control Act was passed. The plain intendment of this act is that in the absence of negative vote in a constitutional local option district that the sale of liquor is anticipated and that everyone has a reasonable right to buy liquor from a legal source, and if this right is to be circumscribed and no legal source allowed to be available in a county, it must be for some strong and compelling reason. The people of a district can decree that no liquor shall legally be sold therein, but that district

would be Sussex County and not the Town of Bridgeville, and no municipality, of and in itself, constitutes a local option district. Consequently the individual opinions of citizens of Bridgeville, or even the collective opinion of a small portion of Sussex County, can not be accepted as an expression of views under the local option provisions.

The (2) and (3) grounds of objection may, in a measure, be considered together, for in such manner they were largely treated by the objectors. It is argued that no license is necessary in Bridgeville for the reason that everyone who desires to purchase liquor could do so at Greenwood or Seaford, five or seven miles away, respectively, and where there are licenses, and that the legal sale of liquor in bottles brings in its wake great disorder among the transient labor and the consequent need for police protection. Now this argument is difficult to follow. If the distance of five or seven miles to Greenwood or Seaford be so short as to make the purchase of liquor easily accessible to anyone desiring to make the purchase, and that such purchase brings with it the accompanying disorder, then it is difficult to see under what principle this disorderly element feared at Bridgeville should be thrust upon Greenwood or Seaford. On the other hand, if the distance to Greenwood or Seaford be so great as to act as a preventative to the purchase of liquor by the itinerant laboring element of Bridgeville, then it must also constitute an inconvenience to those permanent residents of Bridgeville of humble means, who are without opportunities of transportation, and these are equally within the provisions of the law as the richer neighbor with one or more automobiles.

I think the fact that licenses exist at Greenwood and at Seaford has little to do with the solution of the problem. There is no indication from the statement of the Board in this case or its action in other cases, as shown

by the record, that the Commission considered that licensed establishments at a distance of twelve miles from each other a sufficient compliance with "public convenience."

I now come to the concluding argument and, perhaps, the one most relied upon. It is shown that in Bridgeville are important canneries using a large proportion of foreign itinerant or "floating" labor, and that this is also true of the fruit, berry and truck farms of the neighborhood. The number of these laborers is variously estimated at from 1,200 to 2,000 people, not all being present at one time but coming and going from May to November, according to the demands of the season or the exigencies of the crops, it being purely a seasonal employment. It seems to be established that the imported labor is of an extremely low type.

It is argued that to have a place licensed for the legal sale of liquor where such liquor would be available to this transient labor would be provocative of disorder and disturbance. On the other hand, it appears in the record that large quantities of illicit liquor is sold in Bridgeville, or as one witness said, "There is more bootleg liquor sold in and around Bridgeville than there is legal liquor sold in Greenwood or Laurel." It is also in evidence that in Bridgeville during the last year the Liquor Commission alone found seven stills for the production of illicit liquor, and some five other persons were arrested by it in connection with illegal sales. The whole tenor of the Liquor Control Act is based upon the encouragement sought to be given to the legal sale of liquor and the consequent destruction of the illegal traffic.

As it is difficult, if not impossible, to foresee the extent to which the transient labor will indulge in legal liquor in preference to the apparently available illegal liquor, so it is equally impossible to forecast the effect on law and order. A number of the good people of Bridgeville think

that the legal sale of liquor will make necessary a greater force for the preservation of order, and yet it is in the record that Greenwood, with a much smaller number of transient laborers, but with a legal license to sell liquor in bottles, has not "had a town officer for years."

I disclaim any ability to forecast the effect that the grant or refusal of a license may have, and prefer to base my conclusion on the obvious purpose and intent of the act. This purpose and intent, as I read it, is that the inhabitants of a community are entitled to have the opportunity to make, with reasonable convenience, a legal purchase of liquor. The permanent residents of Bridgeville and community are resident there for twelve months in every year. I find nothing in the act to indicate that the residents of Bridgeville and community are to be denied their right to make a convenient and legal purchase of liquor throughout all the winter months, merely because of an importation of foreign labor during the summer. This right, I think, is protected by the law and, indeed, is the very purpose of the present act.

All that I have heretofore said has been based upon the theory that the Liquor Commission has a general power to grant or refuse a license. I think, however, that such is not the intent of the act. The act would rather indicate that the normal right of a community is to be entitled to have a reasonably convenient opportunity to legally purchase liquor, and of an individual to maintain such establishment. The act then gives express limitations on both these rights. *Sec.* 6153 of the *Revised Code*, 1935, forbids the granting of a license in a district contrary to a prohibitory law in such district, at an agricultural fair, exhibition or race-track meeting. It provides for the refusal of a license in the vicinity of a church, school or college.

*Sec.* 6151 sets out nine grounds upon which the Commission may refuse a license. Seven of these grounds concern the applicant and provide for the refusal where the applicant (2) has not furnished bond; (3) appears financially irresponsible or neglects to provide for his family or does not pay his debts; (4) has a forbidden connection with a manufacturer of liquor; (5) uses alcoholic liquor to excess or has been arrested for drunkenness or driving while intoxicated; (6) made false statements to the Commission; (7) been convicted of any violation of the liquor laws or convicted and imprisoned for any crime or misdemeanor; (8) has maintained a noisy, lewd, disorderly or unsanitary establishment. It is conceded that none of these reasons apply to this applicant or furnish any grounds for the present refusal.

The two remaining grounds are

"(1) That there are sufficient licensed premises in the locality or that the granting of a license in the locality set out in the application is not demanded by public interest or convenience. * * *

"(9) That there is any other reason which in the opinion of the Commission based on public convenience or necessity warrants its refusal to grant such license."

I think that *Section* 9 furnishes little ground for the refusal of the license. It is obvious that the "other reason" which would justify the refusal of the license must be "based upon public convenience or necessity." Now the words "public convenience or necessity" clearly have reference to the ability of the public to have available a convenient place to make a legal purchase of liquor and there is nothing in the record to sustain a refusal on this ground, save the proximity of Greenwood or Seaford. This question I have heretofore considered.

Much reliance is placed upon *Section* 1, as above set out, as the reason for the refusal of the license.

It is clear that, except for the proximity of Greenwood and Seaford, the first clause of the section constitutes no ground. That clause has solely to do with the existence of other licensed premises in the locality. There is much reason to believe that the entire section treats of the same subject matter, and that the remaining portion of the section is used in the sense of *"ejusdem generis,"* or that all of the subjects are of similar import. Certainly this is borne out by the use of the concluding word "convenience."

Even assuming that *Section* 1 of the causes of refusing a license contemplates some reason beyond public convenience or the existence of other licensed premises (which I doubt) there remain but the words "public interest" to give a basis for the consideration of the testimony concerning the itinerant or floating labor and the effect of a licensed place upon such labor. I have indicated that I think the right of the permanent residents of Bridgeville and community to have available, during the entire year, the opportunity to make a legal purchase of liquor with reasonable convenience, can not, in the exercise of a sound legal discretion, be denied upon the ground of the presence of such itinerant labor in the community for a few months.

The grant or refusal of a license must be based upon the exercise of a sound legal discretion having in mind the purposes and intent of the act. When the exercise of this sound legal discretion is shown to exist it will not be interfered with; when it is not shown to exist the action can not be sustained. The right of appeal accorded an applicant from a refusal to grant a license indicates that his rights are not finally measured by the refusal. A Commissioner might conclude that public interest did not require the granting of any license whatever in a county, and thus substitute his views for a constitutional referendum; or he might say that one license in a county is sufficient.

Such action would be clearly violative of the intent of the act.

 I think the clear purpose and intent of the "Liquor Control Act," *Rev. Code* 1935, § 6130 *et seq.* is that, except as prevented by some prohibitory law, the residents, rich or poor, of each community shall have a reasonably convenient opportunity to make a legal purchase of alcoholic liquor. If such is not the intent of the act or the legal rights created under it, then the Legislature has full power and ability to make the intent and meaning more clear. This is the function of the Legislature and not to be usurped by the court by virtue of a strained construction of a statute.

An order will be entered reversing the action of the Delaware Liquor Commission in refusing the license.